**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

KEVIN BUTENHOFF,

*Plaintiff,*

**vs.**

SAINT LOUIS COUNTY, JON BELMAR, in his individual and official capacity as a Chief of St. Louis County Police Department; CRAIG KRISKA, in his individual and official capacity; FRANKIE HAUS, in his individual and official capacity; KEVIN WHITEHEAD, in his individual and official capacity; MICHAEL ANDREW, in his individual and official capacity; SUSAN DOHERTY, in her individual and official capacity.

*Defendants*.

Case No. 4:22-cv-323

**Complaint**

For his Complaint, Plaintiff Kevin Butenhoff, by and through his attorneys, states and alleges as follows:

**Introduction**

1. This case arises out of the decision of St. Louis County Police Department officers to tase and shoot Plaintiff, despite the fact that he was outnumbered nine to one in an enclosed space, and posed no threat to any of the officers.

2. At the time, Plaintiff was in the midst of a mental health crisis. The decision to shoot him was the predictable consequence of the County's failure to train its officers in the proper use of force and how to handle individuals with mental health problems.

## Jurisdiction and Venue

3. This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331, 1343, and 42 U.S.C. §1983, 1988.

4. Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the District of Missouri. Moreover, upon information and belief, all of the parties reside in this Judicial District.

5. Plaintiff further invokes the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367 to adjudicate pendent claims arising under the laws of the State of Missouri.

## The Parties

6. Plaintiff Kevin Buttenhoff has, at all relevant times, resided in Saint Louis County, Missouri.

7. Defendant Saint Louis County is a political subdivision ofthe State of Missouri, organized and existing under and by virtue of the laws of Missouri.

8. Defendant Chief Jon Belmar was the Chief of Police of the Saint Louis County Police Department ("SLCPD"), at the time of Plaintiff's shooting. He is being sued in his individual and official capacity.

9. Defendant Craig Kriska was, at all relevant points, a sergeant with the SLCPD and the officer in charge at the time of Plaintiff's shooting. He is being sued in his individual and official capacity.

10. Defendant Frankie Haus was, at all relevant points, an officer with the SLCPD. He is being sued in his individual and official capacity.

11. Defendant Kevin Whitehead was, at all relevant points, an officer with the SLCPD. He is being sued in his individual and official capacity.

12. Defendant Michael Andrew was, at all relevant points, an officer with the SLCPD. He is being sued in his individual and official capacity.

13. Defendant Susan Doherty was, at all relevant points, an officer with the SLCPD. She is being sued in her individual and official capacity.

## Facts

### A. Plaintiff's Shooting

14. On March 19, 2019, Defendant Andrew and his partner, Officer Bradley Murray received a call of a "suspicious person" who had walked through the front door of a business and the exited the rea of the building. The caller did not report that this person – who turned out to be Plaintiff – had done or said anything threatening, only that he was "acting strange." The caller said that the Plaintiff had then gone into the basement of a nearby apartment building.

15. The SLCPD officers went to that apartment building's basement and found that the door was locked. They attempted to communicate verbally with Plaintiff through the door. At the time, none of the Officers had any reason to believe that Plaintiff was a danger to himself or anyone else. The building manager confirmed that there was no one else in the basement with Plaintiff.

16. Defendant Andrew and Office Murray then called for backup.

17. Defendant Kriska arrived shortly after and was able to get the key to the basement room from the property manager. As the Sergeant, Defendant Kriska was in charge of coordinating the plan for how to deal with Plaintiff. In the meantime, Defendant Whiteside had arrived at the scene with a riot shield, and Defendant Haus arrived with a bean bag shotgun.

18. In total, nine officers entered the storage room. These officers found Plaintiff crouched in the corner nearly naked, attempting to wrap a chord around his neck and yelling at the officers to shoot him.

19. At the time, Plaintiff was not making any threats – verbal or otherwise – to the officers. Nonetheless, while Plaintiff was half concealed behind a water heater, Officer Haus fired two bean bag rounds from a shotgun on Defendant Kriska's command, striking Plaintiff. At the time, Plaintiff was between 10 and 15 feet away.

20. While beanbag rounds are considered "less than lethal," they cause severe pain, broken bones, and penetrative injury. In many instances, beanbag munition use requires hospitalization. It has been widely documenting that these munitions can cause horrific injuries – so much so that several municipal police departments have banned them in all but the most limited circumstances.

21. According to a report by the Police Assessment Resource Center, beanbag guns should not be used on individuals who are less than 21 feet away. That same reported noted that beanbags may present a high risk of death and serious injury when fired less than 10 feet away.

22. After being struck, Plaintiff began moving toward the officers. The officers then fired a series of non-lethal weapons: Officers Andrew fired his taser and Officer Doherty fired numerous bean bags from a shot gun; at the same time Officer Whitehead discharged his firearm twice, striking Plaintiff in the hip and grazing his hand.

23. Plaintiff was then taken to the hospital and treated for the gunshot wound.

24. In the aftermath of the shooting, the Officers gave false testimony that Plaintiff had "lunged" at them with a pipe. On the basis of this false testimony, Plaintiff was charged

with attempting to assault a police officer.

25. The Defendant officers agreed to present the pipe story to investigators and the prosecutor's office to provide an excuse for the excessive use of force. In fact, Plaintiff never had a pipe. When asked whether they had been asked to identity the pipe, the officers answered in the negative. When asked to describe the pipe, officers gave estimates that ranged from 12 inches to 36 inches. Two pipes were recovered from the scene; however, not only did the officers not identify them as the instrument that Plaintiff had been wielding, none of the pipes had Plaintiff's finger prints on them.

**B. Excessive Use of Force**

26. Any reasonable officer would have known that the force that was used against Plaintiff was excessive.

27. Departmental General Order 10-29 governing the Use of Force provides that the force must be proportional to the level of resistance. It states that the appropriate response for psychological intimidation or verbal non-compliance is "officer presence; verbal direction (commands of direction or arrest). It only authorizes the use of Tasers when the subject is physically resisting, non-lethal impact munitions when the subject is engaging in "overt actions of assault," and deadly force only when the "subject's behavior [is] likely to cause death or serious physical injury."

28. Defendant Haus, on Defendant Kriska's command, used a non-lethal impact munition (the beanbag shot) at a distance of less than 15 feet – *i.e.*, a distance which can inflict lethal injury – in clear violation of that General Order. At the time, Plaintiff was not acting in a threatening manner; instead, he was crouched, half-naked, and hiding behind a water heater. The officers had no reason to believe that Plaintiff posed a harm to them

or anyone else. Nor did they have any reason to believe that he had committed any crime.

29. Only after Plaintiff was shot twice with beanbag shot did he start to approach the police. He did not resist arrest, nor did he disregard any verbal instructions. At this point, there were seven officers with weapons train on Plaintiff and one with a riot shield. The officers could have easily subdued Plaintiff; no reasonable officer in that situation would have felt at risk of seriously bodily harm. Instead, they turned into a firing squad: Defendant Andrew fired his taser (a violation of the General Order insofar as Plaintiff was not resisting), Defendant Doherty fired more beanbags at Plaintiff (which, at a range of less than 10 feet, constituted the discharge of a lethal weapon), and Defendant Whitehead shot Plaintiff twice with a firearm.

**C. Failure to Train**

30. The excessive use of force against Plaintiff is the direct consequence of the SLCPD's failure to provide adequate training to its police officers, both in how to apply force in general, and how to handle people, such as Plaintiff on the day in question, who are experiencing mental health crises.

31. Best practices require officers to use various techniques to stop a situation from escalating. Prior to confronting a subject, officers are also supposed to develop a plan for how to subdue the subject if the situation escalates. As part of that plan, officers are supposed to use verbal commands first. Merely disregarding a verbal command is not grounds to deploy non-lethal force such as tasers or beanbag guns. Rather, such force is only permitted if the officer reasonably feels that the subject is a threat to the officer's safety or the safety of others. Lethal force, in turn, may only be used where it is absolutely necessary to prevent severe bodily harm.

32. These best practices were not followed: the officers panicked and used non-lethal and then lethal force, despite having had ample time to develop a plan to subdue Plaintiff without causing injury.

33. These errors originate are the inevitable consequence of widely-recognized, long-standing training deficiencies in the SLCPD. The problem originates with the Saint Louis County Municipal Police Academy ("the Academy"), which trains officers SLCPD officers. That Academy – which is operated and overseen by the Saint Louis Board of Police Commissions, and whose curriculum Defendant Belmar controlled – has failed to provide training to deescalate conflicts between police officers and civilians and consistently promoted a "shoot first, ask questions later" agenda. The training at the Academy directly undercuts and is contrary to the SLCPD's Departmental General Order (hereinafter "DGO") 10-29 Use of Force, provides "while the use of reasonable physical force may be necessary in situations which cannot be otherwise controlled, force may not be resorted to unless other reasonable alternatives have been exhausted or would likely be ineffective under a particular set of circumstances." A 2015 report by the Department of Justice put Defendant Belmar and St. Louis County policymakers on notice of the deficiencies in the Academy's training.

34. Once the cadet left the Academy and joined the SLCPD, they should have received further training in de-escalation and use of force. They did not. The SLCPD failed to provide scenario-based training or drill its officers in how to avoid the unnecessary use of lethal force. As a direct result, officers routinely use non-lethal force and deadly force in circumstances where there is no immediate risk to their safety. SLCPD has contributed to this problem by failing to reprimand police officers who use objectively unreasonable

amounts of force, including lethal force, thereby giving rise to a culture in which officers believe they can literally get away with murder.

35. The SLCPD and the Academy have trained police officers in "Killology" or "warrior style" training at the Saint Louis County Regional Law Enforcement Training Conference, at least as far back as October of 1999. Such trainings continued in the subsequent decades and have produced generations of officers who are overly prone to resorting to unnecessary violence. The "warrior cop" mentality teaches police officers to start from a place of fear, which can encourage them to quickly turn to the use of deadly force, instead of considering de-escalation tactics and/or non-deadly force. The "Killology" mindset teaches officers that the very same streets they patrol are "war zones" and police officers are soldiers. As "soldiers," the officers are encouraged to use deadly force as quickly as possible.

36. The leadership of the SLCPD, including Defendant Belmar, was long been aware of the need for better training.

37. As early as 1999, the Department of Justice (DOJ) advised "modern training includes techniques to use the least amount of force necessary to overcome the subject." The DOJ also warned that "police departments should also provide training tactics that are useful in averting violence where confrontation is necessary," such as "conflict resolution," which has proven to "prevent physical conflict and save the lives of many people, including officers and suspects."

38. In its 2014 Collaborative Reform Initiative, which defendant Police Chief Jon Belmar of the SLCPD specifically requested participation in, the DOJ urged defendant SLCPD to "enhance basic academy and supervisor in service training…including de-escalation

training." The DOJ also urged defendant SLCPD to "reduce use of force and injuries to both officers and citizens."

39. In 2015, the DOJ warned that "training on use-of-force issues should be more holistic and integrated, with fewer lecture-based training sessions, and more scenario-based training, in which officers are put through realistic role-playing exercises where they must make choices about how to respond to the types of incidents that often occur." The DOJ advised that the most efficient way to train officers to handle difficult situations is to equip them with the different scenarios, in which all of the situations are considered at the same time, and officers can train to handle such scenarios, while also abiding by department policies and making decisions.

40. In 2016, the Police Executive Research Forum (PERF) warned that the "de-escalation policy should also include discussion of proportionality, using distance and cover, tactical repositioning, slowing down situations that do not pose an immediate threat, calling for supervisory and other resources. Officers must be trained in these principles, and their supervisors should hold them accountable."

41. Despite these admonitions, the leadership of the SLCPD and the Academy failed to incorporate a specific de-escalation policy in any of their General Orders for policing prior to the shooting of Plaintiff, including a failure to specifically incorporate any scenario-based de-escalation policy.

42. The SLCPD and the Academy have also failed to draft written guidelines that emphasize the need for de-escalation and limiting the lethal use of force. That failure has drawn extensive criticisms, including from County Executives and Commissioners of Saint Louis, who have been publicly calling for amendments to the written policy since at least

2020.

43. Indeed, the need for such an amendment has been acknowledged by individuals within the SLCPD, including by Lieutenant Colby Dolly ("Lt. Dolly"), commander of the Bureau of Research and Analysis for SLCPD, who stated "I will concede that our current use of force policy, the language can be improved. What I envision is that we do need to make clear, even in the layout of the policy, that the default starting position is that you don't use any force. That's where everything begins, is that we do not want to use force and we shall de-escalate as much as possible and exhaust everything reasonable before using force. I do agree that there is room for improvement there."

44. As of November 13, 2020, the SLCPD further acknowledged the department had no formal de-escalation policy regarding use of force. On November 13, 2020, the SLCPD held a virtual Use of Force Seminar, which was hosted by Lt. Doly. During said seminar, the following question was posed to Lt. Dolly: Where are the provisions for de-escalation technique?" Lt. Dolly responded: Very good question. I actually agree with that point. If it's a point saying we need to have that in the policy, I would agree with that. …If you're saying it needs to be spelled out in terms of what does that mean and what you (Officers) should do, I would agree with you."

45. Compounding this problem is the woefully deficient training that the County and the SLCPD provides to police officers in how to deal individuals in the midst of a mental health crisis.

46. SLCPD Order 19-086 outlines the protocol for responding to such crises: when a call comes in, the closest available Crisis Intervention Team ("CIT") is to respond to the call. A CIT officer is defined as "a specially trained employee whose function is to respond to

incidents involving mental health crisis where the officer's specialized skills may be used to successfully conclude an incident and to provide further assistance beyond the actual call."

47. However, a vast majority of these "CIT officers" – including the officers that were present at the scene when Plaintiff was shot – only undergo a single, 5-day course. This one-time event is plainly inadequate. Officers who are on the force for decades are not retrained in CIT principles. As a result, over time, they forget CIT techniques and begin to treat those with mental crises as "aggressors" against whom force is automatically justified.

48. The inadequacy of training was on full display here. Plaintiff was clearly in the midst of a mental health crisis. According to the officers, he was rambling incoherently and trying to hang himself. Yet, when Defendant Andrew – who had undergone CIT training – was asked at deposition whether he thought Plaintiff might have had "a mental health issue," Defendant Andrew responded: "Not sure. I didn't consider it, at that point, a mental health."

## CAUSES OF ACTION

### <u>Count I– 42 U.S.C. §1983 – Fourth Amendment Violations (Excessive Force)</u>

*Against All Defendants*

49. Plaintiff incorporates and re-alleges all preceding paragraphs as though full pleaded herein.

50. The Fourth and Fourteenth Amendments protect individuals against the unreasonable use of police force, both before and during seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Edrei v. Maguire*, 892 F.3d 525, 540 (2d Cir. 2018). These amendments are binding on municipalities. *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010).

51. Officers Kriska, Haus, Whitehead, Andrew, and Doherty's use of force against Plaintiff was excessive, objectively unreasonable and in violation of Plaintiff's constitutional rights. At the time of his shooting, Plaintiff was unarmed and posed no threat to any of the officers. The officers made no attempt to deescalate the situation – they did not give any commands to Plaintiff to stay back. Instead, the officers immediately resorted to the use of lethal force.

52. Officers Kriska, Haus, Whitehead, Andrew, and Doherty's use of force was wanton and malicious and have caused Plaintiff severe physical and emotional suffering.

53. The excessive force is the direct consequence of the failure of the SLCPD Chief of Police Belmar to ensure that officers within his department were properly trained.

**Count II – 42 U.S.C. §1983 – (*Monell*) *Failure to Train & Discipline***

*Against County Defendants*

54. Plaintiff hereby incorporates and re-alleges all preceding paragraphs, as though fully pleaded herein.

55. The Saint Louis Charter vests the Board of Police Commissioners with the authority to formulate policies governing the operation of all police departments within the County of Saint Louis.

56. For twenty years, policymakers and officials within the County of Saint Louis – including all individuals on the Board of Police Commissioners – have been on notice that there is a problem with the SLCPD using excessive force, especially against those in the midst of a mental health crisis. The Chiefs of Police of SLCP was repeatedly put on notice of this problem: they knew about the lack of adequate training, about the absence of written guidelines, and about the epidemic of police violence that this had caused.

57. As a direct and proximate result of the acts and omissions described herein, Plaintiff suffered compensatory and special damages as defined under federal common lawand in an amount to be determined by jury.

**Count III – Assault and Battery**

*Against Officer Defendants*

58. Plaintiff hereby incorporates and re-alleges all preceding paragraphs, as though fully pleaded herein.

59. Officers Kriska, Haus, Whitehead, Andrew, and Doherty's use of force against Plaintiff was objectively unreasonable and excessive. At the time of the shooting, the Defendant Officers were aware that Plaintiff did not pose any threat.

60. As a direct result of those actions, Plaintiff has suffered grievous physical and emotional injury.

61. Each Officer Defendant is jointly and severally liable for the assault against Plaintiff.

**Prayer for Relief**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. A declaration that the Officer Defendants violated Plaintiff's constitutional rights by using excessive force;

2. A declaration that the County violated Plaintiff's constitutional rights by failing to train its officers in proper use of force;

3. Compensatory and punitive damages;

4. Attorneys' Fees;

5. For the appointment of a receiver or similar authority to ensure that the Saint

Louis County Police Department properly train and supervise all County and City Police Department Officers.

6. For such other and further relief as this Court deems just and equitable.

Dated: March 18, 2022

**SANTANA LAW PARTNERS**

/s/ ________________________
Jaime Santana
Admitted in Eastern District of Missouri
555 Madison Avenue – 5th Floor
New York, N.Y. 10022
Tel: (212) 448-0055
Fax: (646) 349-2185
E-mail: jaime@santanalawpartners.com

*Attorney for Kevin Butenhoff*